Date signed August 13, 2012




THOMAS J. CATLIOTA
U. S. BANKRUPTCY JUDGE

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**at Greenbelt**

| | | |
|---|---|---|
| In Re: | * | |
| Environmental Preservation Assoc., Inc. | * | Case No. 10-14421-TJC |
| | * | Chapter 7 |
| Debtor | * | |
| *********************************** | * | |
| Endurance American Specialty Insurance Company | * | |
| | * | |
| | * | |
| Plaintiff | * | Adversary |
| vs. | * | Case No. 10-00751-TJC |
| Merrill Cohen, as Trustee in Bankruptcy for Environmental Preservation Associates, Inc. d/b/a USA Lights, and K&S Muirkirk Associates | * | |
| | * | |
| | * | |
| Defendants | * | |

**MEMORANDUM OF DECISION**

Plaintiff Endurance American Specialty Insurance Company ("Endurance") brought this adversary proceeding against defendants Merrill Cohen, as Chapter 7 trustee for the estate of Environmental Preservation Associates, Inc., d/b/a USA Lights ("EPAI"), and K&S Muirkirk Associates ("K&S Muirkirk") (collectively referred to herein as "Defendants"). Now before the

Court are the parties' cross-motions for summary judgment. Docket Nos. 70, 72. Endurance seeks a determination that it is entitled to rescind the environmental impairment insurance policy it issued to EPAI due to EPAI's misrepresentations in the insurance application. For purposes of the pending motions, Defendants do not dispute that EPAI made misrepresentations, but contend that Endurance waived its right to rescind by failing to do so upon learning of the facts that gave rise to the rescission claim. The motions have been fully briefed and argument has been heard. For the reasons set forth herein, the Court concludes that Endurance has not waived its right to rescind the insurance policy. Accordingly, the Court will grant summary judgment in favor of Endurance and deny Defendants' cross-motion.

**Procedural History**

Endurance filed its two count complaint seeking declaratory judgment against EPAI on October 4, 2010. K&S Muirkirk, EPAI's landlord, was granted leave to intervene by order entered on November 9, 2010. In Count I, Endurance seeks to have the insurance policy declared void *ab initio* due to material misrepresentations made in the application. In Count II, Endurance seeks a declaration that it is under no obligation to provide coverage for the complaint filed against EPAI by the Maryland Department of the Environment ("MDE").

Following a hearing on the parties' initial cross-motions for summary judgment, the Court denied the cross-motions. In so doing, the Court bifurcated the issues in the proceeding into the so-called "rescission/waiver issues" and the "exclusion of coverage issues". The Court thereafter allowed the parties an opportunity for discovery and re-briefing for renewed motions on the rescission/waiver issues and stayed the resolution of the exclusion of coverage issues.

The Court has jurisdiction over this matter under 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

**Material Facts Not in Dispute**

EPAI, a Maryland corporation, was engaged in the removal of hazardous chemicals from lighting fixtures, thereafter reselling the glass and chemicals. EPAI operated two plants in Maryland, one in Hyattsville, which closed in 2006, and the other in Beltsville, which EPAI leased from K&S Muirkirk. On March 3, 2010, EPAI filed a petition for relief under chapter 7.

*The Policy*

On June 10, 2009, EPAI applied for and on July 7, 2009 Endurance issued the Environmental Impairment Liability insurance policy (the "Policy"), policy number EIL 101008381-00. Declaration of Gil M. Coogler ("Coogler Decl."), Ex. 3 ("Wunderlich Aff.") at Ex. A. The Policy covered EPAI's operations at the Beltsville facility for the period of July 5, 2009 through July 5, 2010, with limits of two million dollars for the Pollution Condition Limit, and two million dollars in the aggregate. Wunderlich Aff. Ex. B. The total premium paid for the issuance of the Policy was $6,575. *Id.*

In connection with obtaining the Policy, EPAI completed an application (the "Application") which included questions about its compliance with environmental regulations, and the existence of pre-existing environmental conditions that could lead to a claim under the Policy. Specifically, the Application contained the following questions, and EPAI's answers thereto are set forth in brackets:

A. Facility Specific Information:

> ***
>
> Has this location ever had any unregulated emission, discharge, release or escape of pollutants or other substances? [EPAI marked the box labeled "No" in response to this question.]

> Is the Applicant aware of any pre-existing condition at this location that might lead to a claim under the policy if it were to be issued? [EPAI marked the box labeled "No" in response to this question.]
>
> ***
>
> E. Regulatory Compliance
>
> a) Is the Applicant/Facility currently in compliance with all applicable environmental regulations? [EPAI marked the box labeled "Yes" in response to this question.]
>
> If no, attach a description detailing the measures being taken to comply. [No documents were attached.]
>
> b) Has the Applicant/Facility ever been cited for any environmental or permit violation? [EPAI marked the box labeled "No" in response to this question.]
>
> If yes, attach a description detailing the violation, the steps taken to come into compliance, and the final outcome of the violation. [No documents were attached.]
>
> c) Does the Facility conduct regular environmental audits? [EPAI marked the box labeled "Yes" in response to this question.]

Wunderlich Aff. Ex. A at 6.

The Policy provides coverage for covered losses resulting from "Pollution Conditions"[1] that occurred during the policy period or any retroactive date and that were "Discovered"[2] and reported to Endurance during the policy period. It contains several exclusions, including the following:

> Known Conditions
>
> Any Pollution Conditions Discovered prior to the inception of this Policy. This exclusion does not apply to Pollution Conditions disclosed to the Company prior to the inception of this Policy and specifically listed by endorsement.

Wunderlich Aff. Ex. B at 15.

The Policy also includes the following conditions:

> Representations and Covenants

[1] The Policy defines "Pollution Condition(s)" as "the gradual or sudden unintended discharge, dispersal, release or escape of Pollutants at, upon, within, under or migrating from a Scheduled Location which the Insured had not Discovered at the time of inception of this Policy, unless such previously Discovered Pollution Condition has been listed by endorsement, is first reported to the Company during the Policy Period, and commenced during the Policy Period or after the Retroactive Date, if any." Wunderlich Aff. Ex. B at 12. No Discovered Pollution Condition was listed by endorsement by the Debtor.

[2] The Policy defines "Discovered" as "the point in time at which any officer, director, executive or employee responsible for environmental compliance of an Insured becomes aware of the existence of a Pollution Condition." Wunderlich Aff. Ex. B at 8.

> The Named Insured acknowledges and agrees that:
> - The information, warranties and representations contained in the application submitted by the Insured as well as in all supplemental documents provided herewith are true, correct and complete; and
> - The Company has issued this Policy in specific reliance upon the truth and accuracy of the warranties and representations contained in the application…
> - All activities of the Insured have been and will be conducted in full compliance with Environmental Laws.
>
> ***
>
> Concealment or Fraud
>
> If the Insured willfully concealed or misrepresented any fact or circumstance material to the granting of coverage under this Policy, the entire Policy shall be void.

*Id.* at 26-27.

*Site Inspections and the MDE Complaints.*

On May 14, 2009, less than thirty (30) days before EPAI submitted the Application, inspectors from the MDE conducted a site inspection at the Beltsville facility. Following that inspection, MDE issued a site complaint based on numerous violations of environmental regulations that were outlined in the report. The site complaint required EPAI to immediately cease operations of a lamp crushing device, to cease discharge of pollutants, and to correct specific hazardous waste violations outlined in the report. Wunderlich Aff. Ex. K-1. A follow-up inspection occurred on May 19, 2009 where the inspector found that EPAI had not complied with the requirements of the May 14 site complaint. Wunderlich Aff. Ex. K-2. Further follow-up site inspections occurred on May 21 and 27, 2009, both indicating continued noncompliance with the May 14 site complaint. The report of observation from the May 27th inspection indicated that "as of [May 27, 2009], the facility continues to fail in complying with the…regulations" as outlined in the report and the May 14 site complaint. Wunderlich Aff. Ex.

K-4 at 2. EPAI did not reference or submit any of these reports or information with the Application.

On September 22, 2009, the MDE filed a complaint with the Maryland Office of Administrative Hearings against EPAI (the "September 2009 MDE Complaint"), claiming that EPAI had violated Maryland law that regulates controlled hazardous substances at their Beltsville facility. Wunderlich Aff. Ex. F. The findings from the May 2009 site inspection were referenced in the September 2009 MDE Complaint. The MDE conducted another site inspection of the Beltsville facility on December 2, 2009, which resulted in an additional site complaint being issued against EPAI by the MDE.

EPAI engaged Mary Rosewin Sweeney to assist in the submission of a claim to Endurance in January of 2010. Coogler Decl., Ex. 6 at 11:12-17. According to Ms. Sweeney the September 2009 MDE Complaint sought a penalty of up to $100,000 and "it was probably captioned a corrective order that directed the company to evaluate the site and, depending upon the results of that evaluation, develop an action plan, which would have to be implemented." *Id.* at 15:20-3.

On January 29, 2010, Wendy Bumbernick, the President of EPAI sent to Endurance a letter regarding the Notice of Pollution Condition and Claim under Policy EIL101008381-00 (the "Notice Letter"). Wunderlich Aff. Exs. C & D. The Notice Letter provided:

> Dear Sir or Madam:
>
> On January 11, 2010, [EPAI] d/b/a USA Lights ("Named Insured") was advised by the [MDE] that a sample of dust collected in the interior of the Named Insured's premises at 12036 Old Baltimore Pike, Beltsville, MD (a "Scheduled Location"), exceeded acceptable levels for mercury under the U.S. Environmental Protection Agency's Toxicity Characterization Leaching Procedure and was thus considered hazardous waste. Therefore, the Named Insured hereby submits this Notice of Pollution and Condition and Claim under the terms of the above

referenced policy and seeks coverage for any and all covered costs, expenses and liabilities up to the limits of the policy.

The Named Insured had previously been served by MDE with an administrative complaint and order, a copy of which is attached along with related documents. The complaint and order seeks penalties for alleged violations of State regulations and directs the Named Insured to perform certain activities. Prior to and following the service of this administrative complaint, the Named Insured received certain inspection reports from the Department of the Environment, copies of which are also attached.

Based on communications with the [MDE], it appears likely that the [MDE] will require soil and groundwater evaluations of the Scheduled Location and, depending on the results, may require cleanup activities.

The Named Insured engaged legal counsel, M. Rosewin Sweeney of Venable, LLP, mrsweeney@venable.com, with regard to the Department's administrative complaint and order. However, the Named Insured recognizes that Endurance has the right to designate legal counsel under the terms of the policy.

The Named Insured's landlord is K & S Muirkirk Associates. Mr. Travers Daniels has been advised of the Department's action and sampling results. Other individuals with knowledge of these circumstances are the employees of MDE whose names appear in the attached documents and employees of the Named Insured.

A settlement conference has been scheduled by the Maryland Office of Administrative Hearings for February 11, 2010 and a hearing has been scheduled for March 22-23, 2010 on the [September 2009 MDE Complaint].

Sincerely,

Wendy Bumbernick
President

Wunderlich Aff. Ex. D.

Attached to the Notice Letter were copies of the September 2009 MDE Complaint, the MDE's May 2009 Reports of Observation, Field Notes and Site Complaint. Endurance's Claim Director, Steve Wunderlich, testified at his deposition that he had read the Notice Letter by February 1, 2010, reviewed the September 2009 MDE Complaint by February 8, 2010 and reviewed the entire attachment to the Notice Letter within two to three weeks of its initial receipt. Declaration of Dave L. Elkind ("Elkind Decl."), Ex. 7 at 46:1-25, 49:1-25-51:1-25. Wunderlich further testified that he was aware of the 2009 MDE site inspection within one week

of receiving the Notice Letter in February of 2010, but did not review the inspectors' reports until about 2-3 weeks after receipt of the Notice Letter. *Id.* at 51:1-54:25. Wunderlich reviewed both the site inspection reports and the MDE's and EPAI's prehearing statements in order "[t]o assess the entire claim, whether or not there may be more than one claim being forwarded. To assess what sort of damages were involved, what the State might require [EPAI] to do." *Id.* at 54:12-15. Wunderlich indicated that he understood the Notice Letter to mean that "the claim against [EPAI] had occurred on or about January 11, 2010, or at a minimum, during the effective dates of the Policy issued to EPAI [July 5, 2009-July 5, 2010] and that the claim involved an allegation of elevated mercury levels at a specific place in a specific building on the Beltsville site." Elkind Decl. Ex. 5 ¶ 19. During those first few weeks after reviewing the Notice Letter and attachments, Wunderlich concluded that he "needed additional information and needed to conduct additional investigation." Certification of Gil M. Coogler, Ex. D at 58:13-18.

The Notice Letter stated that a settlement conference was scheduled for February 11, 2010 by the Maryland Office of Administrative Hearings, only thirteen days after it was submitted. The administrative hearing on the September 2009 MDE Complaint was scheduled for March 22-23, 2010. Wunderlich Aff. ¶ 17. Due to the looming hearings, "in recognition of the broad duty to defend," and the time necessary to conduct an investigation, Endurance assigned Robert Ferguson as counsel to represent EPAI at the settlement conference and administrative hearings. *Id.* at ¶ 22.

Ferguson thereafter advised Wunderlich that a settlement had been reached with the MDE. The MDE agreed that they would dismiss the September 2009 MDE Complaint if Endurance agreed to fund the site study, which consisted of soil and groundwater testing of EPAI's premises. *Id.* at ¶ 23. A March 10, 2010 email between Ferguson and counsel for the

MDE, Mr. Zimmerman, memorializes the settlement agreement. *Id.* at ¶ 24; Wunderlich Aff. Ex. E. Endurance specifically expressed in the email, on which Ms. Sweeney was copied, a "full reservation of rights" with regard to any further action in defense of EPAI by Endurance once the results of the Bishop study were received. Wunderlich Aff. Ex. E.

As stated above, EPAI filed for relief under Chapter 7 on March 3, 2010. By letter dated May 17, 2010, Wunderlich informed bankruptcy counsel for EPAI that the September 2009 MDE Complaint had been withdrawn/dismissed. Wunderlich Aff. Ex. H. at 1. He also stated that, in return, Endurance had agreed to fund a site study at the Beltsville facility. *Id.* Given the uncertainty regarding the results of the site study, Endurance again expressed a reservation of rights and indicated that it did not intend to waive any of the "declarations, notice provisions, insuring agreements, exclusions, definitions or conditions of [the Policy] nor its rights, including the right to deny coverage under the [Policy], with regard to any subsequent or any new claims submitted at the Beltsville site or any other site." *Id.* at 2.

Bishop and Associates ("Bishop") was retained to conduct the site study and issued its report by letter dated June 14, 2010 (the "Bishop Report"). Bishop found the presence of substantial quantities of hazardous and regulated materials at the facility. Wunderlich Aff. Ex. I at 2. Specifically Bishop issued some fourteen conclusions and recommendations, including:

- Access to the site should be restricted to properly trained personnel.
- Most airborne Mercury vapor concentrations at the site exceeded the Maryland Risk-Based Indoor Air Quality Standard.
- Any personnel working in the area would likely be occupationally exposed the Mercury concentrations in excess of the OSHA Permissible Exposure Limit.
- Wipe samples depict contamination with Mercury and Lead in most of the areas sampled.

- The lower level office and upper level warehouse were contaminated with Mercury.

*Id*. at 4-5. Bishop concluded that the "Client should acknowledge that the scope of mitigating this Site is large, and will require a substantial commitment of technical expertise, labor, time and money." *Id*. at 5.

Wunderlich testified at his deposition that shortly after receipt of the Bishop Report, he reviewed the Application for the first time. Certification of Gil M. Coogler, Ex. D at 105:7-18. The applications are only reviewed if it is "detected that there would be some sort of issue with regards to the policy." *Id.* Following the issuance of the Bishop Report, the MDE filed an amended administrative complaint against EPAI on June 24, 2010 (the "June 2010 MDE Complaint"), citing back to the initial May 14, 2009 site inspection of the Beltsville facility and detailing the findings there from. Wunderlich Aff. Ex. J. The June 2010 MDE Complaint sought a $100,000 administrative penalty. Thereafter on July 10, 2010, K&S Muirkirk sent a notice letter to Endurance seeking damages to the premises for environmental cleanup. On July 16, 2010, the Chapter 7 trustee sent a notice letter asserting coverage claims to Endurance.

In a letter dated July 27, 2010 (the "July 27 Letter"), Wunderlich informed EPAI and the trustee, that Endurance denied any obligation to provide coverage for the June 2010 MDE Complaint due to "(1) misrepresentations in the [A]pplication for the Endurance policy and (2) the prior discovery of the contamination at issue." Wunderlich Aff. Ex. L at 1-2. Endurance went further to state that "Endurance's investigation has revealed that [EPAI] made several misrepresentations in [the Application]. As a result of these misrepresentations, Endurance hereby declares [the Policy] to be void *ab initio*." *Id.* at 2 (emphasis in the original). Endurance further stated that, to the extent that the Policy was not void *ab initio* due to the misrepresentations, Endurance would deny any obligation to provide coverage because the

contamination conditions at issue were discovered prior to and not during the Policy period. *Id.* at 2. The July 27 Letter also provides for a reservation of Endurance's rights.

As acknowledged by Ms. Sweeney, at no point did Wunderlich communicate an intention to waive the right to rescind the Policy for misrepresentation. Certification of Gil M. Coogler Ex. C at 37:13-19. Specifically, as relevant here, the July 27 Letter states that "no act or omission of any agent, servant or employee of Endurance shall be deemed to constitute the waiver or forfeiture of any of Endurance's coverage decision as set forth in this letter." Wunderlich Aff. Ex. L at 11. Further, the July 27 Letter states that:

> Endurance is currently conducting an accounting as to the sums expended under the Policy. A copy of this accounting indicating the net premium remaining will be sent under separate cover to you. A check will then be sent to the Bankruptcy Trustee Merrill Cohen, and if rejected, will be paid into the Court.

*Id.* at 6. Mr. Wunderlich testified that he understood when he wrote the July 27 Letter, that to rescind the Policy, Endurance was legally required to return the premium. Elkind Decl. Ex. 7 at 115. He further testified that although the accounting was completed in 2010, the premium has not been returned. *Id.* at 115, 117-18.

**Conclusions of Law**

The standards for summary judgment are well established in this Circuit:

> A court may award summary judgment only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). In evaluating a summary judgment motion, a court "must consider whether a reasonable [factfinder] could find in favor of the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant." *Apex*, 190 F.3d at 633. In doing so, a court is not entitled to either weigh the evidence or make credibility determinations. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge"). If the moving party is unable to demonstrate the absence of any genuine issue of material fact, summary judgment is not proper and must be denied. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

*Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345, 351-352 (4th Cir. 2007).

*Rescission*

To prevail on a rescission claim, the insurer must make a two prong showing: 1) that a misrepresentation occurred; and 2) that the misrepresentation was material to the risk assumed by the insurer. *Fitzgerald v. Franklin Life Insurance Co.*, 465 F. Supp. 527, 534-35 (D. Md. 1979). The test of materiality has been succinctly put as whether the false representation "would reasonably influence the insurer's decision as to whether it should insure the applicant." *Id.* (internal citation omitted). The parties agree that in Maryland, an insurance policy may be voided *ab initio* if it was issued in reliance on a material misrepresentation made in an application. *See N. Am. Specialty Ins. Co. v. Savage*, 977 F. Supp. 725, 728 (D. Md. 1997).

For purposes of the pending motions, the Defendants concede that material misrepresentations were made in the Application, and that Endurance relied on those representations. They contend, however, that Endurance waived its right under Maryland law to rescind the Policy by failing to do so timely. The Court disagrees.

*Waiver*

Generally, waiver is defined as the "voluntary relinquishment or abandonment -- express or implied -- of a legal right or advantage." Black's Law Dictionary (9th ed. 2009). The Court of Appeals of Maryland more specifically defines waiver as "the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right, and may result from an express agreement or be inferred from the circumstances…And acts relied upon as constituting a waiver of the provisions of a contract must be inconsistent with an

intention to insist upon enforcing such provisions." *Food Fair Stores, Inc. v. Blumberg*, 200 A.2d 166, 172 (1964).

The Defendants base their contention that Endurance waived their right to rescind on the following: 1) Wunderlich received the Notice Letter on January 29, 2010 and thus was in possession of all the relevant facts that supported its rescission claim on that date; 2) Wunderlich read all the documents attached to the Notice Letter by February 17, 2010 and thus knew of all the relevant facts that supported its rescission claim on that date; 3) Endurance ratified the Policy by exercising its contractual right to control the defense of the MDE's action; 4) Endurance has failed to return the $6,575.00 premium once an accounting was completed.

The Defendants cite to *Kemp v. Weber*, 24 A.2d 779, 780 (1942) and *Lazorcak v. Feuerstein*, 327 A.2d 477 (1974) in support of their assertion that a party seeking to avoid a contract must exercise the right to rescind as soon as that party ascertains the facts warranting rescission. The Court in *Lazorcak* states that if a party knows facts that would justify rescission and "does any act which recognizes the continued validity of the contract or indicates that he still feels bound under it he will be held to have waived his right to rescind [the contract]." *Lazorcak*, 327 A.2d at 481. Though *Kemp* and *Lazorcak* both involved contract claims, not specifically insurance contracts, Maryland courts apply these principles of rescission to insurance contracts to prohibit untimely rescission of an insurance policy. *See, e.g.*, *Hartford Accident & Indem. Co. v. Sherwood Brands, Inc.*, 680 A.2d 554 (Md. Ct. Spec. App. 1996) *vacated on other grounds*, 698 A.2d 1078 (1997) (holding that right to rescind was waived by insurance company after it failed to promptly rescind the policy and return all premiums and benefits it received under the terms after learning of the misrepresentation); *Guardian Life Ins. Co. v. U.S. Tower Servs., Ltd.*,

714 A.2d 204 (Md. Ct. Spec. App. 1998) (concluding that where an insured continued to send premium payments, even "under protest", the insured could not rescind the policy).

As stated in *Monumental Life Ins. Co. v. U.S. Fidelity and Guaranty Co.*, 617 A.2d 1163, 1181 (Md. Ct. Spec. App. 1993) (emphasis in the original), "the appropriate focus of the lower court is *not*…when the carrier learns of facts that raise the *mere potentiality* for rescission but, rather, the lower court must determine when the carrier learns the facts that would *justify* rescission."

Here, Wunderlich testified that he reviewed the Application for the first time in June, 2010. At that point, and considering the results of the Bishop Report, he determined that there may well be a basis for rescinding the Policy. Endurance exercised its right to rescind in the July 27 Letter, approximately one month later. Until Wunderlich reviewed the Application after receipt of the Bishop Report, he understood, at most, that there was "the *mere potentiality* for rescission . . . rather [than knowing of] facts that would *justify* rescission." *Monumental Life*, 617 A.2d at 1181.

The "general rule is that the right to rescind must be exercised within a reasonable time, although…the mere question of how much time a party to the contract has permitted to elapse is not necessarily determinative of the right to rescind, the important consideration being whether the period has been long enough to result in prejudice to the other party." *Coopersmith v. Isherwood*, 150 A.2d 243, 247 (1959) (internal quotations omitted) (internal citation omitted). Defendants do not contend that they suffered any prejudice during this period. The approximate one-month lapse from the time Wunderlich reviewed the Application until Endurance rescinded the Policy caused no prejudice to Defendants. It does not amount to a waiver.

Defendants suggest that a factfinder could determine that Wunderlich is not being truthful when he testified that he reviewed the Application for the first time in June 2010. But Wunderlich testified he reviews an application "only" if he detects there is an issue with the policy. He made that assessment after receiving the Bishop Report. Wunderlich's testimony is uncontroverted and he provided a rationale for why he did not review the Application sooner. *Jones v. Owens-Corning Fiberglas Corp.*, 69 F.3d 712, 718 (4th Cir. 1995) (finding that Rule 56 clearly requires more than a party merely reciting the incantation 'credibility,' and have a trial with the hope that the factfinder may disbelieve factually uncontested proof.)

Defendants next argue that Endurance had all the information necessary to conclude that there was a potential for rescission by January, 2010, when EPAI submitted the Notice Letter, and it is irrelevant that Wunderlich did not review the Application until June. But there are no facts in the record that any employee or agent of Endurance made the connection between the disclosures in the Notice Letter and the misrepresentations in the Application until Wunderlich reviewed the Application in June, 2010. Defendants' position is that mere possession of information in the company's files can create a waivable "known right" even if no agent reviews the information and determines that the right exists.

In support of this position Defendants cite to *Supreme Lodge Knights of Pythias of the World v. Kalinski*, 163 U.S. 289, 298 (1896) for the principal that "[i]f [a] company ought to have known of the facts, or, with proper attention to its own business, would have been apprised of them, it has no right to set up its ignorance as an excuse." As to the applicability of this principal in Maryland, Defendants cite to *Baltimore Life Insurance Co. v. Howard*, 52 A. 397, 400 (1902), *Monahan v. Mutual Life Insurance Co.*, 99 A. 949, 951 (1906) and *Medical Mutual*

*Liability Insurance Society v. Miller*, 451 A.2d 930, 935 (Md. Ct. Spec. App. 1982). These cases are all distinguishable.

*Kalinski*, involved the non-payment of lodge dues which was grounds for forfeiture of his benefit certificate, although the insurer continued to accept the payment of assessments, which the insured regularly made. The Court held that the "continued receipt of assessments upon [the insured's] certificate up to the date of his death was a waiver of any technical forfeiture of the certificate by reason of the nonpayment of the lodge dues." *Kalinski*, 163 U.S. at 298. Similarly in *Howard*, the court found the insurance company to have waived the right of forfeiture for non-payment of premiums after the insurer continued to accept premium payments. *Howard*, 52 A. at 400. The court held that the insurer knew or could have known that the insured was more than four weeks in arrears while they continued to collect premiums on the policy. *Id.* The *Monahan* court also held that an insurer waived a forfeiture clause that voided a life insurance policy if more than one policy was taken out on the same life, when the insurer continued to accept premiums. *Monahan*, 99 A. at 951. The court in *Monahan* cited to both *Kalinski* and *Howard* in its holding. *Id.* Lastly, *Miller* involved alleged medical malpractice in a situation in which the insurance company disclaimed coverage when an insured doctor failed to cooperate in the litigation being carried out in his behalf. *Miller*, 451 A.2d at 932-33. The *Miller* court found that, since the insurance company had waited an inordinate amount of time (eleven months) to deny coverage under the breach of cooperation clause, which it knew or should have known, it was estopped from disclaiming liability under the policy. *Id.* at 936. The court specifically found, however, that the insurer had knowledge of the breach of cooperation clause almost a year before it disclaimed liability. *Id.* at 935-36.

*Kalinski*, *Howard* and *Monahan* all involved situations where the insurance company was found to have waived the right to forfeiture after continuing to accept premiums from the insured. *Miller* involved an untimely disclaimer of liability. Clearly these cases are inapposite to the instant case. None involve a misrepresentation of fact by an insured which gave rise to the issuance of a policy, where the sole knowledge of the misrepresentation was with the applicant at the time made. Under Defendant's view, Endurance would be required to review an application immediately upon receipt of any claim to determine if the information submitted with the claim supports a right of rescission. Wunderlich's practice -- that he reviews the application only when he detects there is an issue with the policy – is fair and reasonable and does not support a claim of waiver.

In any event, even if the Court were to impute knowledge of the misrepresentations to Wunderlich when he reviewed the Notice Letter in February, 2010, it would not conclude Endurance failed to rescind within a reasonable time. At that time, a settlement conference on the September 2009 MDE Complaint was scheduled in less than two weeks. As Wunderlich testified, in recognition of its duty to defend, and given the short notice, Endurance provided counsel to defend EPAI. Endurance then agreed to pay for a site study as part of the settlement. During this period, it expressly reserved all rights on two separate occasions -- in the March 10, 2010 email between Mr. Ferguson and Mr. Zimmerman authorizing the site study, and in the May 17, 2010 letter from Wunderlich to EPAI's bankruptcy counsel. EPAI suffered no harm or prejudice during this period, and in fact benefited from Endurance's actions. Once Endurance received the Bishop Report and Wunderlich reviewed the Application, it quickly rescinded the Policy.

As stated by the court in *Monumental*, insurance "carriers themselves may risk bad faith allegations if they rescind too early, *i.e.*, before they have a solid basis to do so. [citations omitted]. [Courts] must therefore accord a fair amount of discretion to a carrier who seeks to rescind a policy, but who delays doing so while making a good faith attempt to investigate whether there are proper grounds for rescission." *Monumental*, 617 A.2d at 1181. Further, under Maryland law, a carrier is required to provide a defense to its insured "[i]f there is the possibility, even a remote one, that the plaintiff's claims could be covered by the policy…" *Litz v. State Farm Fire and Cas. Co.*, 695 A.2d 566 (1997). The Court concludes that Endurance's actions in providing defense counsel and paying for the Bishop Report, while reserving all rights, were reasonable, good faith efforts to balance its obligations to EPAI under the Policy with its own potential rights to rescind or deny coverage as it learned of additional facts that might affect those rights. Endurance's actions neither constitute "the intentional relinquishment of a known right" nor "warrant[] an inference of the relinquishment of such right." *Food Fair Stores, Inc. v. Blumberg*, 200 A.2d 166, 172 (1964).

Finally, the Defendants argue that Endurance waived its right to rescind the Policy for its failure to promptly return the Debtor's premium when it informed the Debtor of its intent to rescind. As the Court of Appeals of Maryland has held:

> [A]s a general rule, the party seeking rescission must indicate to the other party at least the intent to restore the parties to the relative positions which they would have occupied if no such contract had ever been made, and this as soon as the disenchanted party learns of the facts…This offer of restoration or tender back must, at a minimum, demonstrate an unconditional willingness to return to the other party both the consideration that was given by that party and any benefits received under the contract…This effort to resume the status quo is required as, if a party who knows the facts which would justify rescission, does any act which recognizes the continued validity of the contract or indicates that he still feels bound under it, he will be held to have waived his right to rescind.

*Lazorcak v. Feuerstein*, 327 A.2d 477, 481 (1974) (internal citations omitted) (emphasis added).[3]

In the July 27 Letter, Endurance unequivocally expressed to EPAI and the Trustee its intent to rescind the policy and restore the parties to the status quo. It further expressed its intent to return the premium once the accounting was complete, and it continues to state its willingness to do so. Although the continued delay by Endurance in returning the net premium is somewhat perplexing to the Court, the Court notes Wunderlich's testimony that the delay was due to the need for an accounting and thereafter due to instructions from counsel. The Court concludes that, in the July 27 Letter, Endurance did demonstrate an unconditional intent to rescind and an unconditional willingness to return the premium to the Debtor upon completion of the accounting, and that intent was maintained by Wunderlich throughout the course of these proceedings.

In this regard, the Court finds no fault in Endurance's need to complete the accounting prior to a return of a portion, if any, of the premium. By rescission, Endurance is entitled "to disavow [the Policy], get back what [it] has put out and place [itself] in approximately the same position in which [it] would have been had no contract been made." *Lazorcak*, 327 A.2d at 481. To do so, Endurance is entitled to deduct from the premium any amounts it incurred in providing the defense and in obtaining the Bishop Report. Only then would it be placed in "the same position in which [it] would have been had no contract been made." *Id*. *See also*, *Gaver v. Gaver*, 188 A.2d 132, 140 (1939) (one exception to the general rule that the party seeking rescission must restore to the other party the consideration given is where the complaining party is entitled to retain the consideration). Thus, Endurance shall be required to return the net premium remaining after the accounting to the Trustee.

[3] Other exceptions to this requirement that the parties be returned to the status quo were set forth by the Court of Appeals and briefly argued by the parties. *See Funger v. Mayor and Council of the Town of Somerset, 223 A.2d 168 (1966).* Those exceptions need not be addressed here.

**Conclusion**

For the foregoing reasons, the Court shall grant summary judgment in favor of Endurance. A separate order shall issue.

cc: Paul Bennett Bran
David L. Elkind
Dickstein Shapiro LLP
1825 Eye Street, NW
Washington, D.C. 20006-5403

Merrill Cohen
Cohen & Baldinger
7910 Woodmont Avenue, Suite 1103
Bethesda, MD 20814

Nelson C. Cohen
William A. Schreiner, Jr.
Zuckerman Spaeder LLP
1800 M Street N.W.
Suite 1000
Washington, D.C. 20036

Eugene W. Policastri
Bromberg Rosenthal LLP
401 N. Washington St., Suite 500
Rockville, MD 20850

Gil M. Coogler (Admitted Pro Hac Vice)
Mirna M. Santiago (Admitted Pro Hac Vice)
White Fleischner & Fino, LLP
61 Broadway, 18th Floor
New York, NY 10006

**END OF MEMORANDUM**